# HYDE *et al.* v. ISHMAEL *et ux.*

No. 3643.   Opinion Filed June 9, 1914.

1.   **HOMESTEAD—Sale and Conveyance of—Consent of Spouse.** The homestead of a married man cannot be sold without the consent of his spouse given in the manner provided by law (section 2, art. 12, Const. of Okla. [Williams' Ed.]), and the deed of the husband, in which the spouse does not join, is ineffective to convey the homestead.

2.   **SAME—Selection—Overt Acts.** The homestead character may be impressed upon a tract of land without actual occupancy, **provided,** the claimant has a fixed intention to make a home thereon, and such intention is evidenced by overt acts of preparation in the erection of permanent improvements and in the preparation of the land for a home.

3.   **SAME—Occupancy.** The actual occupancy of the land, or an attempt in good faith to do so, must follow the overt acts of preparation without unreasonable delay.

(Syllabus by Galbraith, C.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by Dean Ishmael and Minerva Ishmael, his wife, against C. B. Hyde and others.   Judgment for plaintiffs, and defendants bring error.   Reversed.

*Crump & Fowler* and *Mann, Rogers & Harris,* for plaintiffs in error.

*J. A. Baker,* for defendants in error.

Opinion by GALBRAITH, C.   This was an action in ejectment to recover the possession of the land described in the petition.   The petition was in the statutory form and the answer a general denial.   A jury was waived and the cause was tried to the court.   The court made the following findings of fact:

"That Dean Ishmael was a Seminole freedman, duly enrolled as a member of the Seminole Tribe or Nation of Indians, and as such was allotted the land in controversy as a portion of his allotment of the tribal lands, and the same being designated by the Commission to the Five Civilized Tribes as a 'homestead.'

"Second. That at the time of the allotment of the said lands by the Commission to the Five Civilized Tribes the land was in a raw state and unimproved, and that subsequent to the allotment Dean Ishmael, the allottee, made an improvement lease on the lands, and that under the improvement lease there was built a house and orchard, etc., on the place, and the land was put in a state of cultivation, and that after the lease expired, Dean Ishmael rented the land for a period of one year.

"Third. That Dean Ishmael is a resident and citizen of the state of Oklahoma, and is a married man, and is the head of a family consisting of his wife and three minor children, and that he has been married and living with his wife for twelve years.

"Fourth. That on the 26th day of July, 1908, in the city of Fort Smith, Arkansas, Dean Ishmael executed a warranty deed covering the land in controversy to Rosa D. Rodman, and that Minerva Ishmael, his wife, did not join in said conveyance, and has never conveyed or consented to the conveyance of said land.

"Fifth. That on or about the first of January, after the rental contract expired, Dean Ishmael went to take possession of said land in controversy for the purpose of living upon it, and possession of the land was denied him, and he was ejected from the premises.

"Sixth. That Dean Ishmael does not own any other land except the land in controversy.

"Seventh. That it was the intention of Dean Ishmael to reside upon and occupy the land in controversy at the expiration of the rent contract.

"Eighth. That Dean Ishmael has never resided upon the land in controversy himself, nor his family."

The court, from these findings, concluded as a matter of law that the land in controversy was the homestead of Dean Ishmael, and since the defendants were claiming under a warranty deed executed by Dean Ishmael, in which his wife did not join, that said deed was void and conveyed no title, and rendered judgment in favor of the plaintiffs. To reverse this judgment the defendants have perfected an appeal to this court.

But one proposition is argued and one question raised on the record, and that is, were the premises in controversy the homestead of Dean Ishmael? No importance is attached to the fact that the lands were designated as a "homestead" in the al-

lotment deed to Dean Ishmael, since the word "homestead" as used in the laws of the United States in referring to Indian allotments has not the same meaning as the word "homestead" as used in the Constitution and statutes of Oklahoma. It was said by the Indian Territory Court of Appeals in the case of *Hayes v. Barringer,* 7 Ind. Ter. 697, 104 S. W. 937:

"The homestead of Indian lands, as provided for by the statutes of the United States, is not the same as, and was not established for the purpose that controlled the Legislatures of the states generally, in the establishment of ordinary homesteads. A 'homestead,' as the word is usually used in the statute, is established to secure a home free from the debts of the head of the family, and inalienable by him, and for the benefit of the family. Here the homestead right is not vested in the head of the family, as its head, or created for its benefit, for every member of the family, from the father to the babe in its mother's arms, is vested with a homestead, and all of equal value. * * * What signification, then, is there in the word 'homestead' as used by the statute? And how does it affect the question being discussed? Congress doubtlessly fixed the longer term in which the one tract should remain inalienable than the other, with the expectation and hope that the Indian owner would be induced thereby to build his home upon it; but he is not required to do so. He may lawfully build his home upon the surplus and leave the homestead homeless and tenantless, and still, under the statute, it would remain his homestead. We repeat, what signification, then, is there in the word, except to express the hope of Congress, and designate the one tract from the other? A mere name growing out of an expectation."

The homestead as defined by our Constitution, section 1, art. 12, Williams' Ann. Ed., is as follows:

"The homestead of any family in this state, not within any city, town, or village, shall consist of not more than one hundred and sixty acres of land, which may be in one or more parcels, to be selected by the owner. The homestead within any city, town, or village, owned and occupied as a residence only, shall consist of not exceeding one acre of land, to be selected by the owner; provided, that the same shall not exceed in value the sum of five thousand dollars, and in no event shall the homestead be reduced to less than one-quarter of an acre, without regard to value; and, provided further, that in case said homestead is used for both residence and business purposes, the home-

stead interests therein shall not exceed in value the sum of five thousand dollars; provided, that nothing in the laws of the United States, or any treaties with the Indian tribes, in the state, shall deprive any Indian or other allottee of the benefit of the homestead and exemption laws of the state; and provided further, that any temporary renting of the homestead shall not change the character of the same when no other homestead has been acquired."

Section 2 of this article reads:

"The homestead of the family shall be, and is hereby protected from forced sale, for the payment of debts, except for the purchase money therefor or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon; nor shall the owner, if married, sell the homestead without the consent of his or her spouse, given in such manner as may be prescribed by law; provided, nothing in this article shall prohibit any person from mortgaging his homestead, the spouse, if any, joining therein; nor prevent the sale thereof on foreclosure to satisfy any such mortgage."

The court below found that, although Dean Ishmael had never resided upon the land in controversy himself, nor had his family resided thereon, it was his intention to reside upon and occupy the land in controversy at the expiration of the rent contract. The testimony shows that he did go upon the land with the intention of establishing his home there, and remained there some two weeks, when he was forcibly ejected by the defendants or their tenant, and did not return for fear of bodily injury. Did these acts evidence a fixed intention to presently occupy, accompanied with the overt acts of preparation, and were they sufficient to impress upon the land in controversy the homestead character and to bring it within the protection of the constitutional provision above quoted? It was recently said by this court:

"And we are led to believe that under a liberal rule of construction, situations may be presented where the fixed intention to presently occupy a place as a home, accompanied with overt acts of preparation, such as fitting up or building or preparing a house for occupancy, followed by actually removing therein, without unreasonable delay, would have the effect, at least in equity, of impressing the homestead character, so as to render the

property exempt as against claims prior to actual occupancy." (*Laurie et al. v. Crouch et ux.*, 41 Okla. 589, 139 Pac. 304.)

It is contended on behalf of the plaintiffs in error that there is no evidence in the record to support the findings of the trial court that the land in controversy had been impressed with the homestead character at the date of the execution of the deed under which the plaintiffs in error claim title. This contention seems to be well taken. This was an action in ejectment, instituted by Dean Ishmael, for the purpose of avoiding his own deed. The law imposed upon him the burden of showing by a fair preponderance of the evidence that the land was impressed with the homestead character at the time he executed the deed therefor. The testimony was meager, indefinite, and altogether unsatisfactory. We do not find that Dean Ishmael sustained the burden which the law imposed upon him in this behalf. The testimony does not show the date of the first five-year lease designated as the "improvement lease," when it was made, nor when it expired, nor is it shown by the testimony when the one-year lease was made or what year it covered. It can only be gathered from inference when Dean Ishmael went upon the land with the purpose and intention of making his home thereon. It is important that he should show whether he formed the intent to make his home upon the land before or after the execution of the deed. Under the law, to impress land with the homestead character without actual occupancy, it is essential that the claimant should not only have the fixed purpose and intention to establish a home upon the land, but his attempt to occupy should follow the preparation of the land for a home, the construction of buildings and making improvements thereon, without unreasonable delay. This is necessary in order to show good faith, and in order to determine the question of whether or not the land has been impressed with the homestead character, the court must be advised of the time intervening between the various acts of preparation and the establishment of actual residence upon the land, or an attempt to do so. The very purpose of the homestead law is to provide a shelter for the family—to protect the weak and helpless against their own improvidence,

as well as the designs of the unscrupulous. This purpose is effectuated on the part of the courts by a liberal interpretation of the provisions of homestead laws. It was impossible for the trial court, from the meager testimony before it, to properly find that the land in controversy was impressed with the homestead character at the time of the execution of the deed therefor by Dean Ishmael. The facts connected with the transactions involved in this lawsuit ought to be easily established. They are of comparatively recent date, and living, competent witnesses to all of them should be available. If the claim of Dean Ishmael that the land involved was his homestead at the time he executed the deed therefor is established by competent evidence. then he should prevail in the action, and if such fact is not shown, he should lose.

We conclude that the judgment appealed from should be reversed, and the cause remanded with directions to grant a new trial.

By the Court: It is so ordered.